# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

|  |  |  |
|---|---|---|
| JANA H. WORST | * | |
|  | * | |
| Plaintiff, | * | |
|  | * | |
| vs. | * | |
|  | * | CV 210-137 |
| GLYNN COUNTY SCHOOL DISTRICT | * | |
|  | * | |
| Defendant. | * | |
|  | * | |

## ORDER

Presently before the Court are the parties' cross motions for summary judgment. Pl.'s Mot. Summ. J., Dkt. No. 16; Def.'s Mot. Summ. J., Dkt. No. 18. For the reasons stated below, the Court orders Plaintiff's motion for summary judgment **DENIED** and Defendant's motion is **GRANTED in part** and **DENIED in part**.

## BACKGROUND

Jana Worst ("Plaintiff" or "Worst") was employed with the Glynn County School District ("School District") from August 6, 1999 until February 3, 2009. During that time, Worst worked as a third-grade teacher at Greer Elementary School in Brunswick,

AO 72A
(Rev. 8/82)

Georgia. Notably, the quality of Worst's work is a fiercely contested issue in this case.[1]

At various times during her employment, particularly during 2003, and from 2006 to 2009, Worst took extended periods of leave from work to attend to her serious medical needs or the needs of her children. Prior to the events of December 2009, Plaintiff had no difficulty requesting and taking time off to deal with medical issues. Worst Dep. 42, Dkt. No. 26.

On November 12, 2008, Worst orally informed Camille Shirah, the Greer Elementary School Principal, that she would be having a hysterectomy in Jacksonville, Florida on December 9, 2008. Worst told Shirah that she would need six weeks of leave to recover from the procedure. Worst sent an email to Shirah on November 17, 2008 reiterating the November 12th conversation. Shirah Aff. Ex. 2, Dkt. No. 18-3.

On November 17, 2008, Shirah and Worst had a conversation about Worst's upcoming surgery and absence. Worst and Shirah have differing characterizations of the conversation. Worst claims that Shirah complained that Worst would miss an important

---

[1] Worst points out that she received a perfect score on her performance appraisal for the 2007-2008 school year, and that she received excellent performance appraisals from 1999 to 2007. The School District admits that Worst received a perfect score on one performance appraisal, but denies that her other appraisals were excellent. Moreover, the School District claims that the evidence shows that Worst's job performance was poor and that her conduct caused many interpersonal conflicts with students, teachers, and the administration. See Shirah Aff. ¶¶ 3, 4, Dkt. No. 18, Ex. 3; Lambright Aff. ¶¶ 5, 7, 8, Dkt. No. 18, Ex. 2; Akins Aff. ¶ 4, Dkt. No. 18, Ex. 5; Worst Aff. ¶ 44, Dkt. No. 18, Ex. 3;

workshop during her time off and that Shirah disapproved of Worst's choice for her substitute teacher. Worst further claims that Shirah expressed dissatisfaction "by her facial expressions and tone of voice," and describes the conversation as "a very negative encounter." Compl. ¶ 32, Dkt. No. 1; Worst Dep. 84, Dkt. No. 18, Ex. 3. Shirah, on the other hand, claims she merely asked Worst to attend the workshop if she felt up to it, as her attendance would be beneficial for Worst and the School District. Shirah Aff. ¶ 5, Dkt. No. 18, Ex. 3. Shirah also states that they discussed Worst's upcoming surgical procedure because Shirah had the same procedure previously, and based on her own experience, Worst might have been capable of attending the workshop. Shirah acknowledged that they discussed Worst's choice for a substitute. Either the same day or the day after, Shirah sent Worst a follow up email. Dkt. No. 16, Ex. B. The email was pleasant in tone, thanked Worst for trying to find a substitute, and encouraged Worst to attend the workshop, but only if she felt physically able to do so. Id.

On November 25, 2008, Worst submitted a written notice to the administration communicating the dates of her surgery, her likely return date, and a doctor's note verifying the dates described. Pl.'s Mot. Summ. J., Ex. B-1, B-2, Dkt. No. 16.

On December 3, 2008, Shirah, Assistant Principal Jayne Lambright ("Lambright"), and Instructional Coach Carter Akins

asked Worst to meet with them at the end of the work day. Shirah claims that the purpose of the meeting was to plan for Worst's upcoming absence and to discuss concerns that the administration had about Worst's performance. Worst claims she told Shirah at the beginning of the meeting that she could only stay twenty minutes because she had to attend her daughter's doctor's appointment. Worst claims that her statement was ignored, and Shirah "detained her for about forty-five minutes." Compl. ¶ 41. Shirah disputes this claim, stating "we did not refuse to allow her to leave for the appointment with her daughter's doctor." Shirah Aff. ¶ 6.

During the meeting, the administration officials told Worst about their concerns regarding her performance. Shirah explained that she would prepare a Professional Development Plan ("PDP") for Worst that would, hopefully, improve Worst's performance. Shirah told Worst, "[W]hen you get back from your leave you'd better hit the ground running." Worst Dep. 98. Worst claims that she was "excessively scrutinized and unjustly criticized" during the meeting. Compl. ¶ 45. Worst also claims that "[t]he purpose of the December 3 meeting was to retaliate against [Worst] for her expressed intention of taking leave that was FMLA protected." Compl. ¶ 49.

Shirah followed up the meeting with a memorandum describing the matters discussed at the meeting, including the plans to

institute a PDP upon Worst's return from leave.  Shirah placed the memo in Worst's school mailbox and indicated that Worst needed to sign the memo.  Worst refused to sign the document because, in her view, it contained false statements about her job performance.  When Shirah confronted Worst about signing the memo, Worst continued to refuse.  Eventually, Shirah told Worst that if Worst continued to refuse to sign the document Shirah would send the memo to the Board of Education with a report that Worst refused to sign the document.  Worst signed the document, but included the following statement with her signature: "I am preparing a rebuttal to this memo[.] (J.W.) There are incorrect statements in this memo."  Compl. ¶ 61.

On December 3, 2008, after the meeting, Shirah sent an email to Margie Varnadoe, the Assistant Superintendent of Human Resources.  Pl.'s Mot. Summ. J., Ex. E.  The email described the meeting generally and the plan for Worst.  The email states:

> Just want you to know that I have had a *serious* conversation Jana Worst re: to [sic] her problems with 1-4 on the list of Duties and Responsibilities.  She is having yet another surgery and will be out for 6 weeks.  She is 2&3 grade EIP teacher!  Jayne, Carter, and I talked with her today.  We all shared our concerns.  Tomorrow she will receive a written memo reviewing the meeting and re-stating expectations.
>
> When she returns, I am going to put her on a PDP.  I told her point blank that her behavior was unacceptable at Greer, and I held her accountable for the confusion she is causing.  It is nuts.
>
> *Fun, huh???"*

Id. (emphasis in original).

Worst had her surgery as scheduled on December 9, 2008. One month later, on January 9, 2009, Worst mailed her rebuttal to Shirah's December 3, 2008 memo. After six weeks of medical leave, Worst returned to work on January 20, 2009.

On January 28, 2009, Worst was asked to meet with Shirah and Assistant Principal Lambright. During the meeting, Worst was formally placed on the PDP. Worst claims that Shirah told her that the PDP needed to be satisfactorily completed in order for Worst to continue her employment. Compl. ¶ 70. Worst signed a copy of the PDP. Dkt. No. 26, Ex. 13. Again, Worst felt that she was "excessively scrutinized" at the January 28th meeting. Compl. ¶ 67.

On January 29, 2009, Plaintiff met with Michael Bull, the School District Superintendent in order to discuss her interactions with Shirah. Bull stated that he would try to move Worst to a different school, if a spot was available, and told Worst to take off the following day of work. Worst Dep. 109. Bull indicated that in order to proceed with any reassignment he would need to talk to Varnadoe. Worst Dep. 110, Dkt. No. 26. The next day, Worst participated in a phone conference with Bull and Paul Mackenzie, the Assistant Director of Human Resources. During the call, Bull and Mackenzie stated that Worst and Shirah were not a "good fit." Compl. ¶ 76. The call concluded with

Bull telling Worst that he would contact her regarding a plan to transfer her from her current position.

On February 2, 2009, Plaintiff reported for work as scheduled. At some point that day, Shirah came to Worst's classroom to conduct an observation. According to Worst, Shirah stayed for about two hours, took several notes, and scrutinized her job performance. Shirah claims that Worst knew that observation sessions would take place because Shirah and Worst discussed observations when they met about the PDP. Shirah further claims that she utilized her "standard means of observing and evaluating teachers" and that the length of time she spent in the class room was necessary "to get a clear picture of classroom instruction and climate." Shirah Aff. ¶ 8. Later that day, Lambright came to the classroom and observed Worst for about forty-five minutes. Worst described Lambright as "pleasant." Worst Dep. 115.

The next day, February 3, 2009, Shirah conducted a second observation for approximately one hour. Worst claims that Shirah "interrupted and disrupted Plaintiff" and that Shirah "intimidated . . . Plaintiff." Compl. ¶ 86. Later that day, Worst called Varnadoe, apparently regarding Bull's plan to move Worst to another position. Varnadoe stated that she had already written a letter to Worst about Worst's employment options, and that she was unable to meet in person. Worst asked about the

AO 72A
(Rev. 8/82)

contents of the letter. Varnadoe explained that the letter
provided Worst with three options: Worst could (1) return to
work, and satisfactorily complete the PDP for continued
employment, (2) apply for more family medical leave, with the
knowledge that she would be returning to Greer elementary and
completing the PDP after the leave, or (3) officially resign.
Worst told Varnadoe that she would resign. Worst submitted her
letter of resignation that same day.

Worst later received a copy of the letter Varnadoe had
described. As discussed, the letter provided Worst with three
employment options. The letter also stated that the Board of
Education was concerned with the education of the Greer students
because Worst had missed "24.5 days of the current 76 schools
[sic] days." Dkt. No. 26, Ex. 14. Worst testified that she
based her decision to resign on the February 3rd conversation,
not the contents of the letter. Worst Dep. 118.

Following her resignation, Worst attempted to regain
employment with the Glynn County School District. Worst wrote a
letter to Varnadoe stating that she would like to be rehired.
Varnadoe responded, telling Worst that she would be considered
for a position, but that Worst needed to apply through the
ordinary application process. Dkt. No. 26, Ex. 17.

Worst filed this suit on September 13, 2010. Worst's
Complaint claims that Defendants violated her FMLA rights by (1)

"failing to provide her with notice of her FMLA rights," (2) "interfering with her right to use FMLA protected leave," (3) "discriminating against her for exercising her right to take FMLA protected leave," and (4) "retaliating against her for exercising her right to take FMLA protected leave."[2] Worst also made claims under 42 U.S.C. § 1983. Worst initially named five defendants: the Glynn County School System, the Glynn County Board of Education, Michael Bull, Marjorie Varnadoe, and Camille Shirah. Compl.

Worst voluntarily dismissed all claims against Defendants Michael Bull, Marjorie Varnadoe, and Camille Shirah. Dkt. No. 9. Worst also dismissed her claims arising under 42 U.S.C. § 1983 against Defendants Glynn School System, Glynn County Board of Education, and Glynn County School District. Id. Worst later amended her Complaint to substitute the Glynn County School District in place of the Glynn County School System and the Glynn County Board of Education. Dkt. No. 14. Accordingly, only FMLA-based claims against the Glynn County School District ("School District" or "Defendant") remain pending in this action.

Worst and the School District have filed cross motions for summary judgment. Dkt. Nos. 16, 18. The School District argues

---

[2] Plaintiff states claims based on her FMLA rights to attend to her own serious medical condition and her daughters' medical conditions. Compl. ¶¶ 118-127.

that Worst only asserts claims for interference and retaliation, and that both claims fail as a matter of law. In her motion, Worst asks the Court to grant summary judgment in her favor, and to hold that (1) Defendant violated her FMLA rights, (2) Defendant failed to provided her with notice of her FMLA rights, (3) Defendant's failure to provide notice caused Worst to resign, and (4) Worst is entitled to various remedies, including back pay, back benefits, interest, liquidated damages, and reinstatement. Worst's motion deals only with her interference claim based on the School District's failure to provide notice. Id. at 22. Because the parties' motions deal with many of the same issues, the Court addresses the motions simultaneously.

## LEGAL STANDARD

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Collins v. Homestead Corr. Inst., 2011 WL 4584817, at *2 (11th Cir. Oct. 5, 2011) (quoting Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990)). The court must view the evidence and draw all inferences in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The

party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. The burden then shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## DISCUSSION

The Family Medical Leave Act ("FMLA") provides eligible employees the right to take up to twelve weeks of unpaid leave per year for various medical-related reasons and to be reinstated to their same or equivalent positions after taking that leave. 29 U.S.C. §§ 2612, 2614; Martin v. Brevard Cnty. Pub. Schools, 543 F.3d 1261, 1267 (11th Cir. 2008); Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1294 (11th Cir. 2006). The FMLA creates two types of private causes of action: interference claims and retaliation claims. Hurlbert, 439 F.3d at 1294. Worst asserts, among her claims, both interference and retaliation claims.[3]

---

[3] Worst also states a "Discrimination" claim. The Court is unable to discern any distinction between her discrimination claim and the retaliation claim. The Court's treatment of the retaliation claim, therefore, also resolves

## I. Interference Claim

Interference claims are those claims "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA]." Strickland v. Water Works and Sewer Bd. of the City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001). In order to establish an interference claim, "an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." Id. at 1207. Importantly, the employer's motives are irrelevant in an interference claim. Id.

In this case, Worst has not presented any evidence that she was denied an FMLA benefit to which she was entitled. Worst has only identified two potential instances where her access to benefits was in question. First, Worst claims that she was denied FMLA benefits based on the events of the December 3, 2008 meeting with Shirah, Lambright, and Akins. Worst claimed that she told Shirah at the outset of the meeting that she needed to go to her daughter's doctor's appointment, and that she could only stay for twenty minutes, but that she was "detained" for

---

Worst's discrimination claim, to the extent she has pled discrimination as a separate claim.

forty-five minutes.[4]  Worst did not claim that she asked to leave
at any point during the meeting.

Worst appears to claim that the School District violated
her FMLA rights by failing to guarantee that Worst made it to
her daughter's doctor's appointment on time.  The FMLA does not
impose such a rigorous obligation on employers.  Ordinary and
innocuous business situations, such as this, fall short of
establishing a denial of FMLA benefits.  Worst has failed to
establish an interference claim based on the December 3, 2008
meeting.[5]

Second, Worst seems to claim that Shirah's comments and
actions before or after her six weeks of leave starting December
9, 2009 somehow interfered with her ability to take the six
weeks of FMLA leave associated with her December surgery.  This
claim fails completely.  As stated above, to set forth an
interference claim a plaintiff must show that she was denied an

---

[4] Defendant and its witnesses strongly deny that Worst was prevented from
leaving. See Shirah Aff. ¶ 6 (denying Worst's assertion); Lambright Aff. ¶
11 (denying Worst's assertion); Akins Aff. ¶ 5 (stating he did not perceive
Worst as being prevented from leaving the meeting).

[5] Moreover, the FMLA's private cause of action provision "provides no relief
unless the employee has been prejudiced by the violation." Demers v. Adams
Homes of Nw. Fla., Inc., 321 F. App'x 847, 849 (11th Cir. 2009) (quoting
Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)).
Consequently, where a plaintiff presents "no evidence to show that he had
suffered any loss of income or incurred costs as a result of [the
employer's] denial of" requested leave, no remedy is available for an FMLA
interference claim.  Floyd v. Home Depot U.S.A., Inc., 274 F. App'x 763, 765
(11th Cir. 2008).  Here, even if Worst was prevented from leaving the
meeting, she has not shown that staying at the meeting harmed her in any
way.  Worst testified that her daughter was able to attend her doctor's
appointment.  Worst Dep. 112, Dkt. No. 26.  Worst has not shown prejudice
arising from the December 3, 2009 meeting.

FMLA benefit. Worst received all the medical leave she requested. Worst was not denied an FMLA benefit, and therefore has not provided evidence supporting an FMLA interference claim.

## II. Failure to Provide Notice of FMLA Rights

In Plaintiff's Motion for Summary Judgment, Worst argues that her interference claim is based primarily on the School District's failure to provide notice of her FMLA rights.

The Court initially notes that Worst's factual assertion, that she was unaware that the FMLA provided certain protections, is highly doubtful. Worst had taken FMLA-protected leave multiple times prior to December 2009. On at least one of those occasions Worst was sent a letter from the Assistant Director of Human Resources describing Worst's FMLA benefits. Worst Aff. 34; Ex. 1; Ex. 23. In fact, in 2004 Worst wrote a note stating, "I request four weeks FMLA leave . . . ." Id., Ex. 1, at 22. Even the School District's handbook contains information about employees' FMLA rights and benefits. Worst Aff. Ex. 18. Importantly, the School District claims unequivocally that notice of FMLA rights was posted at Greer Elementary. Shirah Aff. ¶ 9.

Aside from the factual weakness in Worst's claim, interference claims require that the defendant "denied or otherwise interfered with [the employee's] *substantive* rights

under the Act," Hurlbert, 439 F.3d at 1294 (emphasis added).
Typically, if not always, interference claims deal with denial
of an employee's substantive right to medical leave or the right
to reinstatement after that leave.  Worst has provided no
support for her position that a lack of personal notice
constitutes denial of a substantive right under the FMLA.[6]
Consequently, Worst has not stated a recognized interference
claim.  Defendant is entitled to summary judgment on Worst's
claims based on improper notice of FMLA benefits.[7]

Moreover, regardless of whether an interference claim for
failure to provide notice of FMLA rights exists, it is clear
that what Worst has really done in this case is allege a
straightforward retaliation claim.  Worst's theory is that if
she had known that her right to take leave was protected by the
FMLA, then she would have known that Shirah was not free to
retaliate against her, and she would not have resigned from her

---

[6] Worst cites Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81 (2002) for
the proposition that she can prevail on an FMLA claim at summary judgment if
she shows that the School District violated the FMLA by failing to provide
required written notice of benefits and that she was prejudiced as a result.
However, Ragsdale is inapplicable here.  Ragsdale dealt with a regulation
that imposed a penalty on employers under the FMLA.  Id. at 82.
Specifically, the regulation stated that if an employee took leave and the
employer failed to designate the leave as FMLA leave, then the leave did not
count towards the employee's FMLA entitlement.  The Court held that such a
penalty was contrary to the Act's purpose because it required employers to
provide employees with more than twelve weeks of leave per year.  Id.
Ragsdale did not hold that failure to provide notice plus prejudice
establishes an FMLA claim.

[7] Worst's Motion for Summary Judgment was based solely on her interference
claim arising from improper notice.  Dkt. No. 16.  Because the Court is
granting the School District's motion on this issue, Worst's motion is
necessarily denied.

AO 72A
(Rev. 8/82)

position.  Consequently, her notice argument is more accurately an argument that if she had known that her employer was retaliating, then she would not have resigned.  How an employee responds to unlawful retaliation is neither here nor there; the question is whether the employer unlawfully retaliated against the employee.  Worst's notice claim is a straightforward retaliation claim, and must proceed according to the law governing retaliation claims.[8]

## III. Retaliation Claims

Worst argues that the School District retaliated against her by excessively scrutinizing her work and imposing the PDP, ultimately forcing her to resign.  Worst argues that the scrutiny was so intense, and the PDP so intrusive, that she was constructively discharged from her position.  Compl. 110.  The School District argues that Worst has not set forth an FMLA retaliation claim, either under a constructive discharge theory or otherwise.

"To prove FMLA retaliation, an employee must show that his employer intentionally discriminated against him for exercising an FMLA right."  Martin, 543 F.3d at 1267 (citing 29 U.S.C. §

---

[8] It is not lost on the Court that the standards for prevailing on a retaliation claim appear more onerous than the standards for prevailing on an interference claim.  As such, the temptation to turn ordinary retaliation claims into interference claims can be strong.  Difficulty in succeeding, however, is not a sufficient reason for forcing a square peg into a round hole.

AO 72A
(Rev. 8/82)

2615(a)(2) and 29 C.F.R. § 825.220(c)). "Absent direct evidence of retaliatory intent, [courts] apply the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Martin, 543 F.3d at 1267 (citing Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 798 (11th Cir. 2000)). Consequently, a plaintiff claiming FMLA retaliation must first establish a *prima facie* case, by showing that "(1) [she] engaged in statutorily protected activity, (2) [she] suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." Id. If the plaintiff establishes a *prima facie* case, "the burden shifts to the employer 'to articulate a legitimate reason for the adverse action.'" Id. (citing Hurlbert, 439 F.3d at 1297). "If the employer does so, the employee must then show that the employer's proffered reason was pretextual." Id.

The School District argues that Worst is unable to establish a *prima facie* case of FMLA retaliation. Specifically, the School District argues that Worst did not suffer an adverse action because (1) implementation of the PDP did not constitute constructive discharge,[9] as Worst claims, and (2) the implementation of the PDP was not an adverse action in itself.

---

[9] "Constructive discharge qualifies as an adverse employment decision." Poole v. Country Club of Columbus, Inc., 129 F.3d 551, 553 n.2 (11th Cir. 1997).

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009). The Eleventh Circuit has "set a high bar for claims of constructive discharge." Matias v. Sears Home Improvements Prods., Inc., 391 F. App'x 782, 788 (11th Cir. 2010) (quoting Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1363 (11th Cir. 1994)). In order to establish constructive discharge, "[a] plaintiff must show 'the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign.'" Id. Furthermore, a reasonable person is expected not to assume the worst or jump to conclusions, and an employee's unsubstantiated suspicion of a plot by their employer does not evince an intolerable employment action. Foshee v. Ascension Health-IS, Inc., 384 F. App'x 890, 892 (11th Cir. 2010) (holding that employer's posting an employee's position as available and refusing to meet with that employee did not constitute constructive discharge).

Worst claims that she was "constructively discharged by Defendant['s] actions as described throughout this Complaint." Compl. ¶ 110. The Complaint focuses on the following actions: Worst's notice to Shirah that she would be out on medical leave in November, Worst's December meeting with Shirah discussing the

18

PDP, Worst's leave period, the implementation of the PDP in January, and Worst's resignation in February. Although the PDP and its implementation are fairly intrusive measures to identify and correct a poorly performing employee, it is not so unbearable that a reasonable person would feel compelled to resign rather than endure it. Compare Beltrami v. Special Counsel, Inc., 170 F. App'x 61, 62-63 (11th Cir. 2006) (holding that employee was not constructively discharged where employer gave employee a list of extremely difficult work objectives to meet in thirty days or else face termination) with Bryant v. Jones, 575 F.3d 1281, 1299 (11th Cir. 2009) (holding that constructive discharge was established where defendant employer threatened plaintiff physically, verbally abused her, and used racially charged language in the workplace). See also Brewer v. Purvis, 816 F. Supp. 1560, 1574 (M.D. Ga. 1993) (collecting cases denying summary judgment on the issue of constructive discharge). Worst argues that the PDP was the first step in the School District's plan to fire her. The fact that Worst believed that the action would culminate in her termination does not change the result. As noted previously, suspicions of a plot and worst-case-scenario beliefs are insufficient to establish constructive discharge. Foshee, 384 F. App'x at 829. Worst has not established that she was constructively discharged

from her position, and therefore the School District is entitled to summary judgment on the issue.

However, Worst's Complaint can also be construed as claiming that the December 3, 2008 meeting, the PDP, and accompanying observations, were in and of themselves adverse actions made in retaliation for her taking FMLA leave. Compl. ¶¶ 49, 53, 69, 71, 82, 86, and 95. Whether an employment action is adverse for the purpose of FMLA retaliation claim depends on whether the action was "the type of materially adverse action[10] that would dissuade a reasonable employee from engaging in the statutorily protected activity." Bentley v. Orange Cnty., Fla., 445 F. App'x 306, 310 (11th Cir. 2011) (citing Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)). Here, the statutorily protected conduct was the exercise of FMLA leave benefits. Therefore, the relevant inquiry is whether the PDP and its implementation would dissuade a reasonable person from taking FMLA-protected leave.

Under these facts, implementation of the PDP was an adverse action. See Wilson v. O'Grady-Peyton Int'l (USA), Inc., 2008 U.S. Dist. LEXIS 24394, *46 (S.D. Ga. Mar. 26, 2008) (finding that imposition of a performance improvement plan was an adverse

---

[10] There is some dispute in the Eleventh Circuit as to whether an adverse action must be "serious and material" or merely "material" in order to establish a *prima facie* case of FMLA retaliation. See Foshee, 384 F. App'x at 891. In this case, it is not necessary to address the distinction. Even under the higher "serious and material" standard Worst is able to show an adverse action.

AO 72A
(Rev. 8/82)

action for pregnancy retaliation claim). But see Cole v. Illinois, 562 F.3d 812 (7th Cir. 2009)(finding that a performance improvement plan was not a materially adverse action because the employee could have simply complied with the plan and maintained employment). The PDP set forth criteria that Worst had to meet in order to continue her employment with the School District. The PDP also instituted a series of peer and supervisor evaluation sessions. Those aspects alone could reasonably be viewed as so adverse as to dissuade an employee from engaging in the protected activity. But here, it is also apparent that satisfactory completion was required for Worst to keep her job. Worst was told as much on December 3, 2008. The seriousness of the conditional employment threat was underscored by the fact that Worst observed a PDP culminate in termination of another employee. Worst Dep. 118; Worst Aff. ¶ 35. The PDP mandated exceptionally heightened scrutiny which could very possibly result in termination. Consequently, the implementation of the PDP in these circumstances constitutes an adverse employment action.

Once the *prima facie* case is established,[11] the defendant must put forth a legitimate nondiscriminatory reason for its

---

[11] The School District has not disputed the other elements of the *prima facie* case: protected conduct and a causal connection. See Def.'s Mot. Summ. J. 17, Dkt. No. 18 (arguing only that Worst has failed to show an adverse action). The Court notes that it was reasonable for Defendant to not dispute these aspects, given that the elements are likely easy to establish.

AO 72A
(Rev. 8/82)

actions. Martin, 543 F.3d at 1268. Here, the School District

has offered an adequate legitimate nondiscriminatory reason:

multiple behavioral and performance concerns about Worst. Given

that the School District has carried its burden, Worst must show

that the School District's reason - Worst's behavioral and

performance issues - were a pretext for its unlawful employment

action. McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir.

2008).

A defendant's legitimate nondiscriminatory reason cannot be

proved to be pretext, "unless it is shown *both* that the reason

was false, and that discrimination was the real reason."

Bentley v. Orange Cnty. Fla., 445 F. App'x 306, 310 (11th Cir.

2011) (emphasis added) (quoting St. Mary's Honor Ctr. v. Hicks,

509 U.S. 502, 515 (1993)). Moreover, "[c]onclusory allegations,

without more, are not sufficient to raise an inference of

pretext . . . where an employer has offered . . . extensive

evidence of legitimate, nondiscriminatory reasons for its

actions." Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376

(11th Cir. 1996).

---

There can be little doubt that absence for a hysterectomy is protected leave
for a serious medical condition under the FMLA. Additionally, it is
difficult, if not impossible for the School District to dispute the causal
relationship, given the temporal proximity of the implementation of Worst's
protected leave period and the implementation of the PDP. See Brungart, 231
F.3d at 798 (noting that temporal proximity is a strong factor in
determining the causal relationship aspect of a *prima facie* case for
retaliation).

AO 72A
(Rev. 8/82)

Worst has devoted substantial effort to arguing that the School District's proffered reason was false. During her employment, and throughout this case, Worst has disputed every claim that she was anything less than a stellar employee. Worst has provided her employment review in support of her position. There is a genuine issue of fact regarding whether the School District's stated reason was false.

Worst must also show an issue of fact regarding whether discrimination was the real reason for the adverse action. There is evidence that Worst's decision to take FMLA-protected reason was the real reason that the School District implemented her PDP. Worst's evidence includes the temporal proximity between the implementation of the PDP and her FMLA leave. Worst notified Shirah she was taking leave on November 12, 2008 and on December 3, 2008 the School District began the PDP process. Likewise, Worst returned from her leave on January 20, 2009 and the School District formally implemented the PDP on January 28, 2009. The temporal proximity is relevant. However, temporal proximity between FMLA leave and an adverse action, while evidence of pretext, is not enough to establish pretext on its own. Hurlbert, 439 F.3d at 1298.

Worst can also point to multiple instances where her medical leave was discussed in conjunction with the PDP. First, the December 3, 2008 memo from Shirah stated: "It is my hope

that when you return to work after medical leave that you will be able to rectify the aforementioned concerns. Within the first week that you return to school, we will draft a Professional Development Plan so you can strategically plan how you will comply with the teaching expectations of Greer Elementary." Worst Dep. Ex. 11. Second, Plaintiff contends that Shirah's December 3, 2008 email to Varnadoe expresses a connection between Worst's upcoming surgery and the implementation of the PDP. Dkt. No. 16, Ex. 3. That email states, in relevant part: "[Worst] is having yet another surgery and will be out for 6 weeks. She is 2&3 grade EIP teacher!" and "When she returns, I am going to put her on a PDP. I told her point blank that her behavior was unacceptable at Greer, and I held her accountable for the confusion she is causing. It is nuts. *Fun, huh???*" Id. Finally, the February 2, 2009 letter from Varnadoe referred to Worst's total number of absences. Dkt. No. 26, Ex. 14. The letter stated: "We sincerely hope that your health will improve, but missing 24.5 of the current 76 days of schools [sic], we are very concerned about the education of the Greer students." Id.

On the other hand, the School District has presented copious evidence of Worst's behavioral and performance issues: Shirah Aff. ¶¶ 3 (describing Shirah's concerns about poor attendance and inability to work effectively with others), 4

AO 72A
(Rev. 8/82)

(describing Worst's inability to carry out essential job functions); Worst Aff. ¶ 44, Ex. 7 (letter by Principal Ethridge detailing complaints about Worst's behavior); Ex. 11 (memorandum memorializing the topics discussed at the December 3, 2008 meeting); Lambright Aff. ¶¶ 5 (describing a history of yelling at students and making inappropriate comments about students and teachers), 7 (describing Worst's inability to work well with others), 8 (describing Worst's disorganization and poor planning); Akins Aff. ¶ 4 (describing Worst's inability or unwillingness to listen and communicate). In doing so, the School District provides significant support for the proposition that its legitimate nondiscriminatory reason – Worst's performance and behavioral problems – were the real reason for the implementation of the PDP.

Consequently, in evaluating whether the retaliation was the real reason for implementation of the PDP, the Court must consider the temporal proximity and the documented connections between the PDP and Worst's medical leave versus the School District's evidence of behavioral and performance issues. The Court cannot say as a matter of law that Worst's performance and behavioral issues were the real reason for the School District's decision to put Worst on a PDP. There is a genuine issue of material fact regarding pretext, and therefore an issue of fact as to the School District's liability under the FMLA.

AO 72A
(Rev. 8/82)

Accordingly, the School District's motion for summary judgment on Worst's FMLA retaliation claim is denied.

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment is **DENIED**. Defendant's Motion for Summary Judgment is **DENIED** with regards to Plaintiff's retaliation claim based on the implementation of the PDP and **GRANTED** with regards to all other claims and Plaintiff's allegation that she was constructively discharged.

**SO ORDERED**, this 29th day of March, 2012.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)